# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

THURSTON FOODS, INC.,                          3:15cv14 (WWE)
     Plaintiff,

v.

WAUSAU BUSINESS INSURANCE
COMPANY,
     Defendant.

## RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO BIFURCATE

In this action, plaintiff Thurston Foods, Inc., seeks to recover benefits under a commercial property insurance policy issued by defendant Wausau Business Insurance Company. Plaintiff has alleged claims for breach of contract, bad faith, and violation of the Connecticut Unfair Insurance Practices Act ("CUIPA") and the Connecticut Unfair Trade Practices Act ("CUTPA").

Defendant has moved for summary judgment, and plaintiff has moved for partial summary judgment. Defendant has also filed a motion to bifurcate the discovery and trial of plaintiff's breach of contract and extra-contractual claims alleging bad faith and CUIPA/CUTPA violation. For the following reasons, plaintiff's motion for partial summary judgment will be denied; defendant's motion for summary judgment will be granted in part and denied in part; and defendant's motion for bifurcation will be denied without prejudice.

## **BACKGROUND**

The parties have submitted statements of fact with supporting affidavits and exhibits. According to the parties' submissions, the following facts are not in dispute.

Defendant is a wholly owned subsidiary of the Liberty Mutual Insurance Company or the Liberty Mutual Group of Insurance Companies. Plaintiff is a food distributor with a warehouse located in Wallingford, Connecticut. At the time relevant to this action, Patrick Thurston handled plaintiff's property insurance matters. Defendant issued plaintiff an insurance policy effective from August 1, 2010, to August 1, 2011, to insure the warehouse.

The warehouse was constructed in 1990, and contained an industrial freezer. Plaintiff installed and utilized a passive ventilation system under the freezer floor. The passive ventilation system consists of twenty-five, six inch diameter PVC pipes spaced four-feet apart placed in a crushed stone layer that is open to the air at the front and back foundation walls. In 2003, plaintiff constructed an addition to the freezer and expanded the passive ventilation system to include the area under the addition.

### The Policy

The commercial property insurance policy (the "Policy") provided insurance subject to provisions, terms, conditions, and exclusions. The Policy contained a $5,000 deductible that applied to all claims arising under its "Building" coverage.

The Policy provides, in part: "We will pay for direct physical loss or damage to

Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss." The Policy specifies that it covers "loss or damage commencing … during the policy period" of August 1, 2010 through August 1, 2011. In the "Event of Loss or Damage," the Policy imposes a duty to: "Take all reasonable steps to protect the Covered Property from further damage …."

Pursuant to the Policy section entitled "Covered Causes of Loss" under the "Causes of Loss – Special Form," the Policy provides that "[w]hen Special is shown in the Declarations, Covered Causes of Loss means Risks of Direct Physical Loss unless the loss is: 1. Excluded in Section B., Exclusions; or 2. Limited in Section C., Limitations…."

Section B.1.b.of "Exclusions" provides, in part:

> We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss…..(b)(4) Earth sinking (other than sinkhole collapse) rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

Section B.2.d.4. of "Exclusions" provides that defendant "will not pay for loss or damage caused by or resulting from … settling, cracking, shrinking or expansion…."

The Policy provides that defendant "will determine the value of Covered Property in the event of loss or damage … [a]t actual cash value as of the time of loss or damage" subject to certain exceptions enumerated further in Policy. The Policy

specifies that "Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Valuation Loss Condition of this Coverage Form." Further, the Policy provides that an insured "may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis." The Policy states that defendant "will not pay on a replacement cost basis for any loss or damage until the lost or damaged property is repaired or replaced," and '[u]nless the repairs or replacement are made as soon as reasonably possible after the loss or damage."

The Policy covers "Extra Expense," defined as "expenses you incur during the 'period of restoration' that you would not have incurred if there has been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss," as follows:

> Extra Expense Coverage is provided at the premises … only if the declarations show that Business Income Coverage applies at the premises …. We will pay Extra Expense (other than the expense to repair or replace property) to: (1) Avoid or minimize the suspension of business and to continue operations at the described premises or at a replacement premises or temporary location, including relocation expenses and costs to equip and operate the replacement location or temporary location. (2) Minimize the "suspension" of business if you cannot continue "operations". We will also pay Extra Expense to repair or replace property, but only to the extent it reduces the amount of loss that otherwise would have been payable under this Coverage Form.

> According to the Policy terms, "Extra Expense" will be determined based on:

> (1) All expenses that exceed the normal operating expenses that would have been incurred by 'operations' during the "period of restoration" if no direct physical loss or damage had occurred. We will deduct from the total of such

expenses: (a) The salvage value that remains of any property bought for temporary use during the "period of restoration," once "operations" are resumed; and (b) Any Extra Expense that is paid for by other insurance, except for insurance that is written subject to the same plan, terms, conditions and provisions as this insurance; and

(2) Necessary expenses that reduce the Business Income Loss that otherwise would have been incurred.

<u>2011: Snow Accumulation and Interior Damage</u>

In January 2011, snow and ice accumulated on the roof of plaintiff's' building. In early 2011, Thurston noticed water leaking into the interior of its building.

Plaintiff was advised by Stahlman Engineering to remove the snow because its weight could cause structural damage. The snow was removed from the roof and then deposited along the perimeter of the building.

On February 16, 2011, Patrick Thurston spoke by telephone to Karolina Araszkiewicz, then a senior property adjuster, regarding its claims arising from snow removal, damage to the warehouse roof, and damage to the interior offices. During that call, he indicated that Stahlman Engineering had suggested that the snow be cleared off of the roof due to its weight; that plaintiff had paid a contractor and used internal labor to clear the snow off the roof; and that plaintiff's claim was reported late because he had been inundated with workers compensation, auto, and other insurance claims. In his deposition, Thurston later testified that notice was delayed for the additional reason that plaintiff was "taking care of the roof "and being "proactive to stop the leaking, clear the snow first" prior to making a claim.

On February 17, 2011, Araszkiewicz inspected the claimed damage at plaintiff's facility.   According to defendant, she did not observe any damage to the roof except for a possible nine-square-foot area near the gutter line over the warehouse.   However, she concluded that approximately 244-square feet of ceiling tiles required replacement due to staining; 62-square feet of dry wall needed to be replaced; and 288-square feet of drywall needed painting.

By letter dated February 23, 2011, defendant acknowledged receipt of the snow load claim and provided a summary of the damage according to Araszkiewicz's observation.   By letter dated March 15, 2011, defendant advised plaintiff that the snow load claim damages did not exceed the $5,000 deductible.   In an email dated March 30, 2011, plaintiff's broker, Cecile May of USI New England ("USI"), informed defendant that there was additional damage to the roof over the insured's emergency door and to a sign on the side of the building.

By letter, defendant's counsel requested claim documentation regarding the asserted damage.   Plaintiff furnished defendant with an invoice dated February 14, 2011, in the amount of $82,404 for the snow removal; and an invoice dated February 21, 2011, in the amount of $425 from R&S for investigation of the snow removal damage and repair to the roof membrane.   In spring 2011, John Klecha, an agent of USI, asked defendant to consider making payment to plaintiff for the snow load claim. Defendant did not agree to make such payment.

On August 11, 2011, plaintiff provided defendant with additional claim materials in connection with the snow load claim. These materials included a "Building Estimate," which represented $100,963 in interior damages claimed by plaintiff.

On October 7, 2011, David Royal and John Magruder, representatives of defendant, inspected the property. Following the inspection, Magruder prepared an estimate that set the interior damage at $4,475.

The Policy terminated on August 1, 2011. Plaintiff obtained coverage under a policy issued by Arbella Protection Insurance Company, with a policy period from August 1, 2011 to August 1, 2012.

<u>2012:   Freezer Floor Damage</u>

In January 2012, forklift operators complained about the cracking and heaving to the freezer floor. On February 15, 2012, plaintiff notified defendant of the freezer floor damage.

With support from its expert, plaintiff submits that ventilation pipes were blocked by both snow and ice from the roof and existing snow on the ground during the winter of 2011. Plaintiff maintains that the blockage of the ventilation system during the winter of 2011 caused ice to form in the ventilation pipes, and that this ice formation under the floor eventually caused the freezer floor to crack and heave in January 2012.

After the freezer floor heaved, plaintiff engaged a contractor to take video footage of the inside of the pipes that formed part of the underfloor ventilation system. During

this camera investigation, plaintiff did not find any broken PVC pipes, and there was no indication that pipes had cracked. Plaintiff also engaged a contractor to clear the PVC pipes by jetting water through them. Plaintiff subsequently installed equipment to force ambient air through the passive system in an effort to reduce the elevation of the heaving.

In a November 17, 2014 letter, defendant denied coverage under its Policy for plaintiff's claims related to the snow load and freezer floor heaving. Plaintiff has not repaired or replaced the freezer floor.

## **DISCUSSION**

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.).

The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. American International Group, Inc. v. London American International Corp., 664 F.2d 348, 351 (2d Cir. 1981). In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

If a nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, then summary judgment is appropriate.   Celotex Corp., 477 U.S. at 323.   If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met.   Anderson, 477 U.S. at 249.

Defendant moves for summary judgment on the grounds that the Policy does not provide coverage for the snow removal, interior water damage and the freezer floor damage.   Defendant maintains it is not obligated to provide coverage for the snow removal and interior water damage claims because (1) plaintiff has not established a covered loss exceeding the $5,000 deductible; and (2) defendant is relieved of its obligations due to plaintiff's late notice

Defendant asserts further that plaintiff cannot prove that the damage to the freezer floor commenced during the policy period, and the claim is barred by the Policy's exclusions for "Earth Movement" and "cracking."

As to plaintiff's common law bad faith and CUTPA claims, defendant argues that summary judgment is appropriate because the coverage claims are without merit, and plaintiff cannot establish the requisite elements.   Defendant contends that plaintiff has not shown any recoverable damages because it has not repaired or replaced the property.

Plaintiff moves for partial summary judgment on its claim for breach of contract

due to defendant's alleged wrongful failure to pay on its claims that it asserts are covered by the Policy.

Insurance contracts are to be interpreted according to the same rules that govern the construction of written contracts.   Great Lakes Reinsurance (UK), PLC v. JDCA, LLC, 2014 WL 6633039, at *8 (D. Conn. Nov. 21, 2014).   Insurance policy words must be accorded their ordinary and natural meaning, and any ambiguity in the terms of the policy must be construed in favor of the insured.   Hansen v. Ohio Casualty Ins. Co., 239 Conn. 537, 542 (1996).   "The determinative question is the intent of the parties," as disclosed by the policy terms viewed in their entirety.   Community Action for Greater Middlesex County, Inc. v. American Alliance Insurance Co., 254 Conn. 387, 399 (2000). The court must "look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result."   O'Brien v. U.S. Fid. & Guar. Co., 235 Conn. 837, 843 (1996).

In interpreting contract terms, the Court must afford the language used "its common, natural and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract."   Wolosoff v. Wolosoff, 91 Conn. App. 374, 381 (2005).   Where the language of the contract is clear and unambiguous, the contract should be given effect according to its terms.   Breiter v. Breiter, 80 Conn. App. 332, 336 (2003).   A contract is unambiguous when its language is clear and conveys a definite and precise intent.   Cantonbury Heights Condominium, Inc. v. Local Land Dev.

LLC, 273 Conn. 724, 735 (2005).  "A contract term not expressly included will not be read into a contract unless it arises by necessary implication from the provisions of the instrument. . . ."  Heyman v. CBS, Inc., 178 Conn. 215, 227 (1979).  "A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity and words do not become ambiguous simply because lawyers or laymen contend for different meanings."  Barnard v. Barnard, 214 Conn. 99, 110 (1990).

Ambiguity "must emanate from the language used" by the parties.  United Illuminating Co. v. Wisvest-Connecticut, LLC, 259 Conn. 665, 671 (D. Conn. 2002).  If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous.  Lopinto v. Haines, 185 Conn. 527, 538 (1981).  The question of whether a contractual provision is ambiguous presents a question of law.  LMK Enterprises, Inc. v. Sun Oil Co., 86 Conn. App. 302, 306 (2004).  Where a contract term is found to be ambiguous, the court may properly discern the intent of the contract through consideration of extrinsic evidence.  See United Illuminating Co., 259 Conn. at 675.

Plaintiff must prove its claim for breach of an insurance coverage by demonstrating that:   (1) it has an insurable interest in the property; (2) it sustained a loss; (3) it complied with the policy conditions; and (4) it has damages.   "An exclusion should be construed in favor of the insured unless the court has a high degree of certainty that the policy language clearly and unambiguously excludes the claim."

Mercedes Zee Corp., LLC v. Seneca Ins. Co., 151 F. Supp. 3d 255, 259 (D. Conn. 2015). The insurer bears the burden to demonstrate that an exclusion bars coverage under an insurance policy. Allstate Ins. Co. v. Wilson, 18 F. Supp. 3d 156, 160 (D. Conn. 2014).

Snow Removal and Interior Damages

Plaintiff maintains that the costs related to snow removal and interior damage exceed the deductible. Plaintiff asserts that the snow removal costs are covered by the Policy as costs incurred in furtherance of plaintiff's duty to protect the property from increased interior water damage. Plaintiff submits that a question of fact is raised to the extent that defendant disputes the amount of plaintiff's appraisal.

Defendant contends that the snow removal costs constitute maintenance costs that do not fall within the Policy. It asserts further that plaintiff's recovery for snow removal costs are barred by late notice to defendant, and it disputes plaintiff's characterization of the snow removal as falling within its Policy duty to protect the property from further loss. Defendant maintains that plaintiff cleared the roof in response to Stahlman Engineering's advice to prevent structural damage, a potential harm insufficient to trigger the Policy's duty to prevent further harm after damage or loss.

In his deposition testimony, Robert Thurston testified that Thurston worked to remove the snow from the roof after employees had noticed that ceiling tiles were wet

and that the roof appeared to be leaking.   Plaintiff has requested coverage for costs to repair the roof that may have been damaged by the snow removal, replacement of the damaged tiles and undamaged titles that match the new tiles, and repair to damaged signage and the emergency exit.   Defendant asserts these costs are not covered because the roof damage occurred during the snow removal; the tiles do not require matching; and the appraiser had not noticed any damage to signage or the emergency exit.   The Court finds that the question of whether the snow removal constitutes a response to prevent further damage should be resolved by a jury.   Further, the parties' positions raise disputed issues of fact concerning the extent of covered damage that should be resolved by a jury.

Defendant argues that plaintiff's claims for coverage related to the snow removal are barred because plaintiff failed to comply with the terms of the Policy, which require "immediate written notice of loss or damage to Covered Property to [defendant] when knowledge of loss or damage is known to an executive officer, insurance manager or other designated department head."   Defendant maintains that plaintiff failed to comply with the Policy by providing written notice that includes a "description of the property involved."   According to Paragraph Seven of the Amended Complaint, on January 28, 2011, the "ice and snow that had accumulated on the roof of the Plaintiff's building began melting and leaking into the plaintiff's building."   Plaintiff provided notice of its claim for coverage related to the snow removal and roof repair on February 15, 2011.

Under Connecticut law, an insurer may be relieved of its obligations pursuant to a "notice" provision where there is an unexcused, unreasonable delay in notification by the insured that results in material prejudice to the insurer.   Arrowood Indem. Co. v. Kig, 304 Conn. 179, 198 (2012).   Defendant asserts that it was prejudiced by the timing of the notice because the snow had already been removed from the roof and the roof had been patched in fifty-three places.   Defendant claims that it was "severely prejudiced in its ability to make a full investigation of the claimed loss and to come to its own conclusions regarding the scope and timing of the damage."   Plaintiff counters that defendant was not prejudiced by a two-week delay in light of the fact that plaintiff was attempting to remedy the leaking roof and address conditions that could have culminated in building collapse.   Further, plaintiff points out that defendant's agent was able to inspect the roof, the temporary repairs and the interior water damage.   Whether the notice provided caused defendant material prejudice represents another question of fact for the jury.   The Court will deny summary judgment on the snow removal and interior water damage claim.

Freezer Floor Claim

Defendant argues that it should not be obligated for losses or damages that occurred outside of the Policy period between August 1, 2010, and August 1, 2011. Plaintiff agrees that the forklift operators notified plaintiff's management of the heaving

to the freezer floor in early 2012. The parties agree that the Policy covers "loss or damage commencing" during the Policy period. However, the parties disagree about whether the damage falls within the Policy period.

Plaintiff asserts that the Court should find as a matter of law that plaintiff suffered damages covered under the Policy. Alternatively, it submits that its expert testimony is sufficient to raise a question of fact concerning the cause and occurrence of the heaving to the freezer floor. Plaintiff has submitted the affidavit of John Piho,[1] a Registered Professional Mechanical Engineer, who opined that damage to the freezer floor could have commenced even up to one year prior to the floor actually heaving. He explained:

> Spider cracks can exist for months and even years without being noticed. In Thurston, once the pressures of the ice became great enough the spider cracks would enlarge and ultimately portions of the freezer floor would begin to crack open resulting in heaving of the concrete. … Accordingly, it is my opinion with reasonable engineering certainty that the damages to the Thurston freezer floor were the result of the removal of snow and ice from the roof and the blocking of the ventilation pipes.

In an affidavit, plaintiff's expert John Kempf, a mechanical contractor, opined that the concrete freezer floor was damaged "as a result of the depositing of ice and snow

---

[1] Defendant has requested that the Court strike the Piho affidavit evidence as providing contradictory positions to his prior testimony and that of Robert Thurston and expert witness John Kempf. Piho has provided an affidavit clarifying any asserted contradictions. The Court will accept Piho's affidavits for purposes of ruling on the motions for summary judgment. At trial, defendant may cross examine Piho and the other witnesses.

which blocked the air vent system." Defendant asserts that plaintiff's witnesses cannot identify any specific heaving-related damage that "commenced" during the Policy period. Upon review, the Court finds the existence of disputed issues of fact concerning the occurrence of the damage to the freezer floor and whether such damage falls within the Policy's coverage. The Court will leave plaintiff to its proof; defendant may attack the substance of plaintiff's expert testimony on cross examination.[2]

Earth Movement Exclusion

Defendant argues further that the freezer floor damage is barred by the Policy's exclusions. Defendant points out that the Policy excludes damage caused directly or indirectly by "soil conditions" including "freezing, thawing and the action of water under the ground surface," which "cause settling, cracking or other disarrangement of foundations or other parts of realty." This exclusion precludes coverage "regardless of any other cause or event that contributes concurrently or in any sequence to the loss." Defendant maintains that it is undisputed that the heaving damage "was caused either directly or indirectly by 'freezing' in the soil beneath Thurston's freezer floor…."

Plaintiff counters that the instant circumstances do not trigger this exclusion. First, plaintiff argues that the "Earth Movement" exclusion should be viewed in the context of the contract as a whole. Plaintiff asserts that the "Earth Movement"

_____

[2] Additionally, the Court finds that disputed issues of fact preclude a determination as to the applicability of the Policy's exclusion of coverage for "faulty, inadequate, or defective … design."

exclusion, which comprises earthquake, landslide, mines subsidence, and earth sinking, appears to apply to natural or catastrophic events rather than the instant circumstances involving pipes blocked after snow removal from a roof.   However, the contract's encompassing plain language, which states that it includes "all soil conditions," does not suggest such a limited interpretation of the exclusion.

Plaintiff maintains further that the exclusion does not apply because no earth sinking, rising or shifting occurred in this case.   Plaintiff submits that, according to expert opinion, ice formed around the entire subfloor ventilation system, which was located above grade rather than in the soil.   Defendant responds that the "Earth Movement" exclusion does not require that the freezing take place "below grade." However, the exclusion's language---its references to "earth movement," "soil condition" and "action of water under the ground surface"-- indicates that the exclusion may be triggered only by conditions concerning soil or water action under the "ground surface." Thus, construing the inferences of fact most liberally to the plaintiff, it is unclear whether freezing within an above-grade ventilation system that damaged the freezer floor would fall within the earth movement exclusion.   Accordingly, the Court will deny the motion for summary judgment on this issue.[3]

_____

[3] Plaintiff argues that the "Earth Movement" exclusion is also inapplicable because Connecticut courts have adopted the "efficient proximate cause analysis" in cases involving property loss from more than one cause; plaintiff asserts that the blockage of the ventilation pipes after the snow removal constitutes the efficient proximate cause of the damage.   Defendant points out that the contract includes

<u>Cracking Exclusion</u>

Defendant maintains that the Policy contains an exclusion for "loss or damage caused by or resulting from . . . [s]ettlling, cracking, shrinking or expansion." Plaintiff counters that the relevant exclusion states, in its entirety, that defendant "will not pay for loss or damage caused by or resulting from … [s]ettling, cracking, shrinking or expansion." Plaintiff asserts that there was no proof that the freezer floor damage was caused by the spider cracks. However, the spider cracks within the freezer floor do fall within the plain meaning of this exclusion. Thus, to the extent that plaintiff seeks to recover for cracking to the floor under the Policy, such coverage is excluded.[4] Summary judgment will be granted on this issue.

<u>Damages</u>

Defendant argues that summary judgment should enter on plaintiff's claim related

language excluding "damage caused directly or indirectly" by any of the causes listed within the exception. The Court finds no indication that the Connecticut Supreme Court would not enforce such language. <u>See</u> <u>Lombardi v. Universal N. Am. Ins. Co.</u>, 2015 WL 600823, at *5 (Conn. Super. Ct.) (enforcing the contract language that avoided application of the efficient cause analysis). However, the Court still finds that that a jury should resolve the question of whether freezing within the ventilation system caused the floor damage, and if so, whether that damage falls within the "Earth Movement" exclusion.

[4] However, the question of whether the heaving damage commenced within the Policy coverage remains a question of fact for the jury. A jury may consider whether the cracking exception applies because the heaving was "caused by or resulted from" the cracking. In this ruling, the Court must construe all inferences of facts and ambiguities in favor of the plaintiff.

to its freezer floor because plaintiff cannot prove damages. Specifically, defendant claims that plaintiff failed to provide any "information that would allow the finder of fact to determine the amount of loss on the measure recoverable under the policy…." Defendant asserts that the Policy provides for valuation at actual cash value unless the damaged property is "actually repaired or replaced … as soon as reasonably possible." Thus, defendant asserts that plaintiff's damages should be determined according to an actual cash value rather than estimates of replacement. Similarly, defendant contends that plaintiff cannot prove any damages for failure to provide coverage for unincurred expenses that would be necessary during the time that plaintiff rebuilt the freezer floor.[5]

An insurer may have a duty to reimburse an insured prior to rebuilding when the insured does not have the means to rebuild the facility without the insurance proceeds. Celebrate Windsor, Inc. v. Harleysville Ins. Co., 2006 WL 1169816, at *15, n.7 (D. Conn. May 2, 2006). A plaintiff's performance of replacing the damaged property may be excused where a defendant's conduct refusing coverage makes it impossible for a plaintiff to fulfill such condition precedent. Zaitchick v. American Motorists Ins. Co., 554 F. Supp. 209, 217 (S.D.N.Y. 1982).

Plaintiff's public adjuster, Alan Tancreti, provided an estimate setting, inter alia,

---

[5] The Policy defines "Extra Expense" as "necessary expenses you incur during the 'period of restoration' that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss."

the interior damage costs at approximately $100,000, the freezer repairs at $1,851,647 and the extra expense at more than $4 million. Based on the amounts that plaintiff must spend to satisfy the condition precedent prior to even knowing whether defendant will provide coverage, the Court finds that plaintiff's assertion of impossibility presents a question of fact. Further, the Court finds that plaintiff has submitted sufficient evidence of damages.

The Connecticut Supreme Court has stated that actual cash value is the "costs of repairing or replacing the loss, less depreciation." Northrop v. Allstate Ins. Co., 247 Conn. 242, 246, n.3 (1998). Plaintiff represents that Tancreti's estimated that the loss requires a repair to the freezer floor and that the measure for damages is the replacement cost. By affidavit, Tancreti maintains that, at the time relevant to the damages at issue, it was customary in Connecticut to determine actual cash value by taking the replacement costs and applying depreciation based on reasonable age, condition, and wear and tear.[6] Defendant counters that Tancreti erroneously contemplates repairing the floor to a new condition. The Court finds that the questions of whether damages are appropriate is a question for the jury and will leave plaintiff to its proof.

---

[6] Defendant requests that the Court strike Mr. Tancreti's affidavit because he was not disclosed as an expert regarding actual cash value. The Court will accept the affidavit. Mr. Tancreti was disclosed as an expert who was expected to testify concerning the cause of damages and the condition of the property.

Common Law Bad Faith

Plaintiff alleges that defendant has acted in bad faith with regard to treatment of its insureds.   Defendant has argued that summary judgment should enter because plaintiff cannot show the requisite standard for a bad faith claim that the defendant acted consciously to do wrong with a "dishonest purpose or moral obliquity."   Buckman v. People Express, Inc., 205 Conn. 166, 171 (1987).

Plaintiff responds that it will present evidence that defendant went to unusual lengths to find an expert to support its claims after it had abruptly terminated its regularly hired expert during his investigation.   Robert Thurston, plaintiff's corporate designee, testified in his deposition that defendant appeared to be delaying its consideration of the claim and terminated the expert investigator who appeared to agree with Thurston.[7]   Construing the evidence most favorably to plaintiff, the Court will deny summary judgment on this claim.   In the event that a jury finds for the plaintiff on its coverage claims, a reasonable jury could also find that defendant acted in bad faith in denying such coverage.

---

[7] Robert Thurston also indicated he was not certain about other instances of bad faith and deferred to his brother Patrick, who was responsible for insurance.

CUIPA/CUTPA

Plaintiff asserts its CUTPA claim on the basis that defendant's handling of plaintiff's insurance claims violates CUIPA.   Defendant argues that plaintiff cannot prove that defendant had a general business practice of unfair insurance practices.

A claim of unfair insurance practices in violation of CUIPA requires that defendant engaged in alleged misconduct as a business practice.   Lees v. Middlesex Ins. Co., 229 Conn. 842, 849 (1994) ("defendant's alleged improper conduct in the handling of a single insurance claim ... does not rise to the level of a 'general business practice' with sufficient frequency as required by Section 38a-816.").   An unfair insurance practice must have been committed or performed with such frequency as to indicate a general business practice.   McCulloch v. Hartford Life and Acc. Ins. Co., 363 F. Supp. 2d 169, 182 (D. Conn. 2005).

By affidavit of its attorney, plaintiff counters that it has identified a number of complaints against defendant's related entities that have been deemed to be justified. Plaintiff also represents that several lawsuits have been brought against defendant's related entities alleging unfair insurance practices.   Construing the evidence most favorably to plaintiff, the Court finds that plaintiff has raised factual issues relevant to whether defendant has a general business practice sufficient for CUIPA/CUTPA liability. Plaintiff has more than a scintilla of evidence and will be left to its proof.

<u>Motion to Bifurcate</u>

Defendant requests that the Court bifurcate discovery and trial of plaintiff's breach of contract claims and extra-contractual claims for bad faith and CUIPA/CUTPA violation. Defendant maintains that it will be prejudiced by having the coverage and extra-contractual claims tried together. The Court will defer ruling on whether the case should be bifurcated at trial. As to discovery, the Court finds that any remaining discovery relevant to the bad faith and CUTPA/CUIPA claims should proceed and be completed within 120 days of months of this ruling on summary judgment. Accordingly, the motion for bifurcation will be denied without prejudice.

## **CONCLUSION**

For the foregoing reasons, plaintiff's motion for partial summary judgment [doc. #79] is DENIED. Defendant's motion for summary judgment [doc. #82] is GRANTED in part and DENIED in part. The Court grants defendant's motion for summary judgment on the claim for spider cracks fall within the exclusion B.2.d.4 providing that defendant "will not pay for loss or damage caused by or resulting from … cracking." The Court leaves to the jury the questions of whether defendant should provide coverage for the snow removal damage, interior damage and freezer floor heaving damage. Defendant's motion to bifurcate [doc. #75] is DENIED without prejudice. The Court will defer ruling on whether the case should be bifurcated at trial. Any remaining discovery relevant to the bad faith and CUTPA/CUIPA claims should be completed within 120 days

of months of this ruling on summary judgment.

/s/Warren W. Eginton_____
Warren W. Eginton, Senior U.S. District Judge


Dated this __ 17th __day of May, 2017 at Bridgeport, Connecticut.