UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

THURSTON FOODS, INC.,            3:15cv14 (WWE)
       Plaintiff,

v.

WAUSAU BUSINESS INSURANCE
COMPANY,
       Defendant.

## RULING ON CROSS MOTIONS FOR RECONSIDERATION

In this action, plaintiff Thurston Foods, Inc., seeks to recover benefits under a commercial property insurance policy issued by defendant Wausau Business Insurance Company. Plaintiff has alleged claims for breach of contract, bad faith, and violation of the Connecticut Unfair Insurance Practices Act ("CUIPA") and the Connecticut Unfair Trade Practices Act ("CUTPA").

In a ruling dated May 17, 2017, the Court granted in part and denied in part defendant's motion for summary judgment; it denied plaintiff's motion for partial summary judgment. Specifically, the Court granted defendant's motion for summary judgment relevant to the exclusion for spider cracking damage; however, the Court provided that a jury could still consider whether the cracking exception applies as it remains a question of fact whether the heaving damage was "caused by or resulted from" the cracking. The Court also ruled that the jury should consider whether freezing within the ventilation system caused the floor damage, and if so, whether that damage falls within the "Earth Movement" exclusion. Plaintiff requests clarification or

reconsideration of the Court's ruling relevant to the cracking exclusion.  Defendant seeks reconsideration of the Court's ruling regarding (1) failure to disregard the Piho affidavit; (2) failure to find that there is no coverage for snow removal under the Policy; (3) failure to find that there is no coverage for non-damaged matching ceiling tiles included in Thurston's claim submission; (4) denial of summary judgment on the bad faith claims; and (5) misreading of the exclusions relevant to earth movement and cracking.  For the following reasons, the Court will grant the motions for reconsideration and will clarify its prior ruling.

## **DISCUSSION**

A motion for reconsideration "generally will be denied unless the moving party can point to controlling decisions or data . . . that might reasonably be expected to alter the conclusion reached by the court."  Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995).  "The major grounds justifying reconsideration are 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'"  Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992).

Insurance contracts are to be interpreted according to the same rules that govern the construction of written contracts.  Great Lakes Reinsurance (UK), PLC v. JDCA, LLC, 2014 WL 6633039, at *8 (D. Conn. Nov. 21, 2014).  Insurance policy words must be accorded their ordinary and natural meaning, and any ambiguity in the terms of the

policy must be construed in favor of the insured.   Hansen v. Ohio Casualty Ins. Co., 239 Conn. 537, 542 (1996).   "The determinative question is the intent of the parties," as disclosed by the policy terms viewed in their entirety.   Community Action for Greater Middlesex County, Inc. v. American Alliance Insurance Co., 254 Conn. 387, 399 (2000). The court must "look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result."   O'Brien v. U.S. Fid. & Guar. Co., 235 Conn. 837, 843 (1996).

In interpreting contract terms, the Court must afford the language used "its common, natural and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract."   Wolosoff v. Wolosoff, 91 Conn. App. 374, 381 (2005).   Where the language of the contract is clear and unambiguous, the contract should be given effect according to its terms.   Breiter v. Breiter, 80 Conn. App. 332, 336 (2003).   A contract is unambiguous when its language is clear and conveys a definite and precise intent.   Cantonbury Heights Condominium, Inc. v. Local Land Dev. LLC, 273 Conn. 724, 735 (2005).   "A contract term not expressly included will not be read into a contract unless it arises by necessary implication from the provisions of the instrument. . . ."   Heyman v. CBS, Inc., 178 Conn. 215, 227 (1979).   "A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity and words do not become ambiguous simply because lawyers or laymen contend for different meanings."   Barnard v. Barnard, 214 Conn. 99, 110 (1990).

Ambiguity "must emanate from the language used" by the parties. United Illuminating Co. v. Wisvest-Connecticut, LLC, 259 Conn. 665, 671 (D. Conn. 2002). If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous. Lopinto v. Haines, 185 Conn. 527, 538 (1981). The question of whether a contractual provision is ambiguous presents a question of law. LMK Enterprises, Inc. v. Sun Oil Co., 86 Conn. App. 302, 306 (2004). Where a contract term is found to be ambiguous, the court may properly discern the intent of the contract through consideration of extrinsic evidence. See United Illuminating Co., 259 Conn. at 675.

Earth Movement and Cracking Exclusions

Subsection 1.b of "Exclusions" addresses earth movement and provides:

> We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss…..(b)(4) Earth sinking (other than sinkhole collapse) rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

Section 2.d.(4) of "Exclusions" sets forth that defendant "will not pay for loss or damage caused by or resulting from … settling, cracking, shrinking or expansion…." Subsection 2 of the Exclusions concludes with the following language: "But if an excluded cause of loss that is listed in 2.d.(1) through (7) results in a 'specified cause of

loss' or building glass breakage, we will pay for the loss or damage caused by that 'specified cause of loss' or building glass breakage."

Plaintiff points out that Section 2.d.(4) lacks the anti-concurrent language contained within Section 1 relevant to the earth movement exclusion. There is no indication that the anti-concurrent language of Section 1 applies to the cracking exclusion of Section 2.d.(4). Further, the concluding language of Section 2 contemplates coverage of an excluded loss enumerated in subsections d.(1)-(4), such as cracking, when caused by a "specified cause of loss." Prior court decisions have held that analogous language may be reasonably interpreted to mean that an exclusion does not apply to a loss that was caused by a loss not otherwise excluded. See Sentinel Assocs. v. American Mfr. Mut. Ins. Co., 804 F. Supp. 815, 820 (E.D. Va. 1992).

Construing all ambiguity in favor of the insured, the Court clarifies that the cracking exclusion applies unless the cracking was the result of a covered loss. In light of the disputed factual issues identified in the Court's prior ruling on summary judgment, a jury should consider whether the cracking exclusion precludes coverage in this instance.

Relevant to the earth movement exclusion articulated in Section 1, the Court's prior ruling found that the exclusion could be reasonably interpreted as applying to conditions concerning soil or water action under the "ground surface." In light of plaintiff's expert opinion that ice formed around the entire subfloor ventilation system,

which was located above grade rather than in the soil, the Court denied summary judgment to allow a jury's consideration of the applicability of the exclusion to the facts of this case. The Court held that a jury should resolve the question of whether freezing within the ventilation system caused the floor damage, and if so, whether that damage falls within the earth movement exclusion.

Defendant seeks reconsideration, arguing that the earth movement exclusion does not require that the freezing take place "below grade;" and even if even if it could be so construed, the freezing took place under the soil. Defendant argues that the Court has misread the exclusion because the phrase "under the ground surface modifies only the term "action of water" and not the word "soil;" defendant asserts further that "action of water" is not relevant to this case.

Upon reconsideration, the Court will adhere to its decision denying summary judgment. Construing the inferences of fact most liberally to the plaintiff, it is unclear whether freezing within an above-grade ventilation system that damaged the freezer floor would fall within the earth movement exclusion. The exclusion's plain language clearly references "Earth Movement," soil conditions, and action of water under the ground. Earth movement, the listed soil conditions and water action under the ground can be reasonably interpreted as meaning that the triggering event takes place under the ground. Further, the freezing of water, which is asserted in this action, may be reasonably construed as "water action." Thus, the exclusion language---its references

to "earth movement," "soil condition" and "action of water under the ground surface"--indicates that the exclusion may be triggered only by conditions concerning soil or water action under the "ground surface."

The parties have submitted expert opinion relevant to the cause of the heaving. Defendant's expert consultant John Konicki opined that "the formation of ice lenses in the soil underneath the crushed rock layer of the Thurston subfloor caused the heaving at the Thurston warehouse freezer floor" and that the "heaving could not have occurred without the formation of the ice lenses in the soil beneath the crushed rock layer of the subfloor."

Plaintiff's consultant John Kempf indicated that "freezing in the soil contributed to the overall heaving in certain areas." In his deposition testimony, plaintiff's consultant John Piho agreed that ice lenses formed under the ground at the Thurston facility, although he qualified that did not know whether the lensing reached into the soil. He elaborated that lenses would have gone into soil, but that his opinion was made without any degree of certainty without looking at the heavage numbers again. He also stated that he could not answer whether lenses went down into the soil to cause the damage without making a lot of assumptions and having more information. In his affidavit submitted in opposition to summary judgment, Piho averred "with reasonable certainty" that:

> [T]he damages to the Thurston freezer floor were the result of the removal of snow and ice from the roof and the blocking of the ventilation pipes. Damages

7

began to occur shortly after the pipes became blocked. The damages would first occur to the insulation, then to the underside of the floor, then to the formation of spider cracks, and then to the widening of cracks and ultimately to heaving of the freezer floor itself.

He disagreed with William Konicki's statements that the formation of ice lenses in the soil underneath the crushed rock layer of the Thurston subfloor caused the heaving at the Thurston warehouse freezer floor, and that the heaving could not have occurred without the formation of ice lenses in the soil beneath the crushed rock layer of the subfloor.

A plaintiff cannot create a material issue of fact by submitting sham affidavits that dispute prior testimony. Fischer v. Forrest, 2017 WL 2992663, at *7 (S.D.N.Y. July 14, 2017). This sham affidavit rule does not apply if the statements are not actually contradictory or the later sworn assertion addresses issues that were not thoroughly or clearly explored. In re World Trade Ctr. Lower Manhatten Disaster Site Litig., 758 F.3d 202, 213 (2d Cir. 2014). The Court finds that Piho did not wholly contradict his prior deposition statements. He qualified that his answers required more information and that his statements were made without reasonable certainty. However, at trial, Piho's prior testimony relevant to freezing soil may affect the jury's credibility determination, Accordingly, the Court adheres to its prior decision and finds that a jury should determine the factual issue relevant to whether the earth movement exclusion is applicable due to a triggering event that took place under the ground.

.

## Failure to Disregard Piho Affidavit Opinion With Regard to Timing of Damage

Defendant faults the Court for accepting the Piho's affidavit that offers an opinion as to the timing of the damage to the property, which defendant characterizes as a sham affidavit. Defendant also maintains that Piho's opinion about the timing of the damage should have been disclosed under Federal Rule of Civil Procedure 26.

During the deposition, Piho answered that he not could identify any damage that occurred prior to August 2011, because he had been focused only on the heavage of the underfloor. He also stated that he could not identify any specific property damage to the underfloor, such as cracking of pipes or rearrangement of gravel, or damage to the mudslab prior to August 2011. He did state that the heaving had started in 2011, and that he should clarify that point in his report.

In his affidavit offered by plaintiff in opposition to summary judgment, Piho stated: "In my opinion, damage to the freezer floor by way of spider cracks would have formed at least six to eight months prior to the floor actually heaving where the fork lift truck operator would have noticed it and the damage to the insulation would have occurred even earlier." In response to defendant's assertion of a sham affidavit, plaintiff submitted another affidavit by Piho, explaining the apparent contradictions: "While I was never asked to identify what damages were likely occurring under the floor leading up to the heave, I clearly stated the heaving was a process, which while identified in 2012, began earlier in 2011."

9

The Court finds that Piho's deposition testimony and his later affidavit relevant to timing are not wholly inconsistent.  In both his deposition testimony and affidavit, he indicated that the heaving process had commenced in 2011.  Further, his affidavit explains the sequence of how the damage would occur rather than itemize specific damage that he had identified as having occurred as of August 2011.  Paragraph 24 of his affidavit states:  "Damages began to occur shortly after the pipes became blocked. The damages would first occur to the insulation, then to the underside of the floor, then to the formation of spider cracks, and then to the widening of cracks and ultimately to heaving of the freezer floor itself."

Upon reconsideration, the Court will adhere to its prior decision accepting Piho's affidavit in consideration of the motion for summary judgment.  At trial, defendant may cross examine Piho regarding his deposition testimony.  Although the opinions of Piho's affidavit are not wholly inconsistent with his deposition testimony, the Court will allow defendant an opportunity to depose Piho regarding his opinion as to the timing of the damage, if necessary.

<u>Failure to find no coverage for snow removal under the Policy</u>;

Defendant asserts that the Court erred by finding that a jury should determine "whether the snow removal constitutes a response to prevent further damage."  Plaintiff asserts that the snow removal costs are covered by the Policy as costs incurred in furtherance of plaintiff's duty to protect the property from increased interior water

damage. Robert Thurston represented that Thurston worked to remove the snow from the roof after employees had noticed that ceiling tiles were wet and that the roof appeared to be leaking. Defendant maintains that there is no coverage for routine maintenance, such as snow removal, because the Policy provides for coverage for "direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss." Defendant argues that the Policy's language setting forth the "Loss Conditions" represent conditions that do not suggest "that party incurs costs associated with complying with a contract." The specific section "Duties In the Event of Loss or Damage" states:

> You must see that the following are done in the event of loss or damage to Covered Property: …Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

The phrase "keep a record of your expenses necessary to protect the Covered Property for consideration in the settlement of the claim" creates an ambiguity as to whether the Policy provides coverage for such costs; construed most favorably to the insured, the Policy is reasonably construed to provide that response costs are considered in the settlement of the claim. Thus, it is appropriate for a jury to determine whether plaintiff's snow removal comes falls within plaintiff's duty to take all reasonable

steps to prevent further damage.   Upon reconsideration, the Court adheres to its prior decision.

### Ceiling Tile Coverage

Defendant claims that the Court erred by denying the motion for summary judgment on the issue of coverage of replacing tiles for matching purposes.   Defendant asserts it is not required to provide coverage for undamaged tiles.   Additionally, defendant claims that plaintiff did not have matching ceiling tiles in many of its facility rooms prior to the damage.   Defendant also points out that a 2013 Connecticut statute enacted to require an insurer to cover the costs of matching tiles or other materials does not apply to plaintiff's claim.   See Conn. Gen. Stat. § 38-316e(a).

Plaintiff submitted the affidavit of Alan Tancreti, who has worked as a licensed Public Adjuster for approximately twenty-five years.   He averred:

> It is my opinion that Wausau is obligated to pay the cost to match all ceiling tiles. In my experience, the general custom in the insurance industry is that if physical damage occurs to a building such as walls, carpeting, exterior siding or acoustic ceiling tiles, for example, if replacement of only the area that was damaged would result in a mismatched condition, the insurance company is required to pay the cost to match.

Although defendant vigorously denies any such obligation, the Court will adhere to its prior decision denying summary judgment on this issue.   A jury should consider the questions of fact relevant to plaintiff's claim for coverage of matching ceiling tiles to restore its facility to pre-loss condition.

Bad Faith Claims

Defendant complains that the Court erred by denying the motion for summary judgment on plaintiff's common law bad faith and CUTPA/CUIPA claims. Defendant maintains that plaintiff did not submit sufficient evidence to defeat summary judgment. In its prior ruling, the Court construed the evidence and inferences of fact most favorably to plaintiff. Upon review, the Court will adhere to its previous decision.

## **CONCLUSION**

For the foregoing reasons, the motions for reconsideration are GRANTED [docs 137 and 138]. The Court adheres to its prior decision in accordance with clarifications articulated in this Ruling.

The Court will allow defendant an opportunity to depose Piho for three hours regarding his opinion as to the timing of the damage, if necessary, within 45 days of this ruling's filing date.

This case is scheduled for jury selection on February 2, 2018, with trial to commence thereafter. The Court will also refer this case to a magistrate judge for a settlement conference.

/s/Warren W. Eginton_____
Warren W. Eginton, Senior U.S. District Judge

Dated this \_\_20th\_\_day of October, 2017 at Bridgeport, Connecticut.